**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| UNITED POWER TRADES ORGANIZATION<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP<br>in his official capacity as President of the United States;<br><br>PETE HEGSETH<br>in his official capacity as Secretary of Defense; and<br><br>LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR.<br>in his official capacity as Commanding General of the U.S. Army Corps of Engineers;<br><br>Defendants. | Case No. 2:26-cv-02107<br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>NOTE ON MOTION CALENDAR:<br>August 11, 2026<br><br>**\*Oral Argument Requested\*** |

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - i

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 3

LEGAL STANDARD.................................................................................................... 7

ARGUMENT ................................................................................................................. 7

    I.    Plaintiffs Will Likely Succeed on the Merits.................................................... 7

        a.    The Executive Order is Ultra Vires .................................................... 7

        b.    The Executive Order and Termination of the CBA Violates the First Amendment..... 11

        c.    The Executive Order Violates the Fifth Amendment .................................. 14

            i.    The Executive Order and Termination of the CBA is an Improper Taking ............ 14

            ii.    The Executive Order and Unilateral Termination of the CBA Violates the Guarantees of Procedural Due Process ................................................................. 15

        d.    The Termination of the Contract Violates the Administrative Procedures Act............ 16

            i.    The Termination Was a Final Agency Action ............................................. 16

            ii.    Defendant Graham Acted Arbitrarily and Capriciously ......................................... 17

            iii.    Defendant Graham Acted Contrary to Law ........................................................... 19

    II.    Absent Relief, Plaintiff Will Suffer Serious and Irreparable Harm................................ 19

    III.    The Balance of Equities and Public Policy Favors Preliminary Injunctive Relief....... 21

CONCLUSION............................................................................................................... 23

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - ii

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

**INTRODUCTION**

Plaintiff United Power Trades Organization ("UPTO") is a labor union that represents hundreds of federal civilian employees employed by the U.S. Army Corps of Engineers ("USACE") at its hydropower civil works projects in the Pacific Northwest. UPTO has been continuously representing federal employees and collectively bargaining on their behalf for 45 years, across multiple presidential administrations (both Republican and Democratic), during both wartime and peacetime. However, on March 27, 2025, President Trump issued an Executive Order ("EO") titled "Exclusions from Federal Labor-Management Relations Programs." Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order") that attempts to eliminate collective bargaining rights for the majority of the federal workforce, including the workers whom UPTO represents.

On April 9, 2026, Secretary of Defense Pete Hegseth issued a Memorandum directing the termination of all Collective Bargaining Agreements to which the Department of Defense is a party. Defendants, including Defendant Graham, the Commanding General of USACE, subsequently implemented the Executive Order and Secretary Hegseth's Memorandum on April 19, 2026, when they terminated the contract between UPTO and the Department of the Army. Plaintiff now seeks a preliminary injunction to prevent the implementation of the Executive Order, and the termination of the CBA, during the pendency of this lawsuit and related litigation challenging the lawfulness of EO 14251.

Courts have repeatedly issued preliminary injunctions to enjoin the implementation of Executive Order 14251, including with respect to other employees of USACE. *See e.g.*, *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025) (*NTEU*); *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248 (D.D.C. 2025) (*AFSA*); *Fed. Educ. Ass'n v. Trump*, 795 F.

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 1

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Supp. 3d 74 (D.D.C. 2025) (*FEA*); *see also Am. Fed. of Labor and Congress of Industrial Orgs. v. Trump*, No. 1:25-cv-2445, Dkt. 44 (Oct. 1, 2025) (*IFPTE*) (enjoining EO 14251 with respect to USACE employees represented by IFPTE and IBEW). Courts, including this one, have also repeatedly issued preliminary injunctions preventing the termination of CBA's relating to this Executive Order. *See, e.g., AFL-CIO v. Noem*, 785 F. Supp. 3d 833 (W.D. Wash. 2025) (*Noem*); *United Nurses Ass'n of Cal. v. U.S. Dep't of Veteran Affairs*, 2026 WL 851188 (D.R.I., Mar. 26, 2026); *AFGE Local 2305 v. Dep't of Veteran Affairs*, 2026 WL 709856 (D.R.I., Mar. 13, 2026). But because these preliminary injunctions predate when Defendants arbitrarily decided to suddenly apply the Executive Order to UPTO and the employees they represent, since UPTO was not a party to these earlier cases and had no reason to be at the time they were filed, these prior preliminary injunctions do not apply to UPTO or the employees it represents. *See Trump v. CASA*, 606 U.S. 831 (2025).

Accordingly, this Court should issue a preliminary injunction to prevent Defendants from applying the Executive Order to UPTO and terminating the contract between UPTO and the Department of the Army. For the reasons stated below, Plaintiff is likely to succeed on its claim that the Executive Order and the subsequent implementation is invalid and unlawful. Moreover, it is beyond dispute that Plaintiff and its bargaining unit employees have suffered and will continue to suffer irreparable harm without preliminary relief. The workers have lost their right to union representation and UPTO has lost its ability to carry out its representational duties. The longer the unlawful Executive Order is applied to stifle the rights' of UPTO and its members, and to prohibit enforcement of the CBA, the more these harms will be compounded. The Government would not suffer comparable harm from maintaining the pre-Executive Order status quo pending a final ruling on the Executive Order, which is likely to be invalidated. Indeed, the Government honored

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 2

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

its contractual commitments under the CBA for more than a year after the Executive Order was issued. On these facts, the Government cannot credibly allege *any* harm.

## BACKGROUND

Plaintiff UPTO is a labor union that represents approximately 545 federal civilian Wage Board employees who work for USACE in Washington, Oregon, Idaho, and Montana. Dkt. 1, ¶ 12; Chambers Decl., ¶ 5. Specifically, UPTO represents electricians, mechanics, lock and dam operators, painters, welders, crane operators, and material handlers on USACE hydropower dam projects in the Pacific Northwest. Dkt. 1, ¶ 13; Chambers Decl., ¶ 6. UPTO has been continuously recognized as the exclusive representative for these employees for 45 years, including during many major national security events and wars and through multiple presidential administrations (both Republican and Democratic) and has been collectively bargaining with USACE. Dkt. 1, ¶ 29; Chambers Decl., ¶ 7. At no time, until recently, has this bargaining ever been questioned as inconsistent with national security. Dkt. 1, ¶ 29; Chambers Decl., ¶ 27. This is because national security is not the primary function of any UPTO bargaining unit employee; indeed, not a single UPTO bargaining unit member is required to maintain a national security clearance. Dkt. 1, ¶¶ 12, 29, 49; Chambers Decl., ¶¶ 8-9.

The Federal Service Labor-Management Relations Statute ("FSLMRS") was enacted in 1978 to "prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). The FSLMRS provided "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. § 7101(a)(1). In enacting the statute,

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 3

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Congress explicitly stated that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a)(2).

The FSLMRS provides the limited authority to exclude an agency or subdivision from its protections if "(A) the agency or subdivision has a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(A)-(B).

On March 27, 2025, President Trump issued Executive Order No. 14251, which excludes at least 16 different agencies and about 75% of the unionized workforce from FSLMRS protections. The Executive Order states that the President determined that each agency listed has "a primary function intelligence, counterintelligence, investigative, or national security work." Executive Order at §1(a). It further states that "Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." *Id.* The Executive Order included the entire Department of Defense, which includes USACE. *Id.* at §2(b). Additionally, the Executive Order specifically delegates authority to the Secretary of Defense to suspend the application of the Executive Order to any "subdivisions of the departments they supervise" and bring them under coverage of the FSLMRS. *Id.* at §4.

The administration issued a Fact Sheet accompanying the Executive Order. *See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* ("Fact Sheet") (Mar. 27, 2025), www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/. The Fact Sheet stated that the Civil

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 4

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Service Reform Act "enables hostile Federal unions to obstruct agency management" and that this is "dangerous in agencies with national security responsibilities." *Id.*

Although the Executive Order asserts that the FSLMRS "*cannot* be applied to [the excluded] agencies and [] subdivisions in a manner consistent with national security requirements and considerations," *see* Executive Order at § 1(a) (emphasis supplied), UPTO has been the exclusive representative of the bargaining unit employees for 45 years. Prior to the adoption of the Executive Order, federal agencies, specifically USACE, never suggested that collective bargaining for UPTO was inconsistent with national security. Indeed, even subsequent to the issuance of EO 14251, up through April 16, 2026, USACE recognized UPTO and continued to engage in labor relations discussions and collectively bargain with the union. Dkt. 1, ¶ 40; Chambers Decl., ¶¶ 13-23; 27-31.

On April 9, 2026, Defendant Hegseth issued a Memorandum entitled "Termination of Certain Collective Bargaining Agreements in Accordance with Executive Order 14251." *Memorandum for Senior Pentagon Leadership* (Apr. 9, 2026), https://media.defense.gov/2026/Apr/22/2003916726/-1/-1/1/TERMINATION-OF-CERTAIN-COLLECTIVE-BARGAINING-AGREEMENTS-IN-ACCORDANCE-WITH-EXECUTIVE-ORDER-14251-EXCLUSIONS-FROM-FEDERAL-LABOR-MANAGEMENT-RELATIONS-PROGRAMS.PDF ("Hegseth Memorandum"). The Memorandum directed the termination of all collective bargaining agreements to which the Department is a party, with limited exceptions for collective bargaining agreements covered by existing injunctions or court orders. Thereafter, on April 16, 2026, Defendant Graham and USACE implemented the Executive Order and Defendant Hegseth's Memorandum with respect to UPTO. On that day, UPTO received a Memorandum stating that, effective immediately, the CBA between UPTO and the Department of the Army was

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 5

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

terminated, and that UPTO was no longer recognized as the exclusive representative of employees. *See* Chambers Decl., ¶ 24; Exhibit 2 to Chambers Decl. (Termination Memorandum).

Neither the Executive Order, the Hegseth Memorandum, nor the Termination Memorandum makes a finding that USACE, or specifically the employees that UPTO represents, have the primary function of national security work, or that Chapter 71 cannot be applied to UPTO employees in a manner consistent with national security requirements and considerations.

On May 26, 2026, UPTO posted on its public website that it intended to file a lawsuit in federal court, seeking an "injunction to reinstate the contract and UPTO's rights under the FSLMRA." *See* Chambers Decl., ¶ 32; Exhibit 1 to Chambers Decl.  Just two weeks later, USACE filed a petition before the Federal Labor Relations Authority ("FLRA") to revoke UPTO's Certificate of Representation, allegedly pursuant to the "President's direction in EO 14251." *See* Chambers Decl., ¶ 33.

Plaintiff filed this lawsuit on June 16, 2026, challenging the lawfulness of EO 14251 and Defendants' unilateral cancellation of the CBA. *See* Dkt. 1. The Complaint asserts six counts: (1) the Executive Order is *ultra vires* because it exceeds the President's authority under 5 U.S.C. § 7103(b)(1); (2) the Executive Order is retaliatory against Plaintiff in violation of its First Amendment rights; (3) the Executive Order violates the Fifth Amendment's Takings Clause; (4) the Executive Order violates the Fifth Amendment's guarantee of procedural due process; and (5) the termination of the CBA the actions is arbitrary and capricious and contrary to law under the Administrative Procedures Act.

Plaintiff seeks a preliminary injunction to enjoin the Defendants from implementing the Executive Order and terminating the collective bargaining agreement against Plaintiff's bargaining

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 6

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

unit workers during the pendency of this lawsuit, and until the legality of EO 14251 as applied to UPTO's bargaining unit has been resolved.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that "(1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). "When the government is a party, the last two facts (equities and public interest) merge." *Id.* "In considering the likelihood of success on the merits, the Court is not strictly bound by the rules of evidence." *Noem*, 785 F. Supp. 3d at 855. "Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a court may consider evidence outside the normal rules of evidence" including hearsay, declarations, and pleadings. *Id.*

## ARGUMENT

UPTO easily satisfies the standard for a preliminary injunction and, as such, Defendants should be preliminarily enjoined from implementing the Executive Order and from terminating the CBA while this litigation proceeds.

### I.   Plaintiffs Will Likely Succeed on the Merits

As described below, each of Plaintiff's challenges to the Executive Order and subsequent implementation will likely succeed on the merits.

#### a.   The Executive Order is Ultra Vires

"In conducting *ultra vires* review, a court must determine whether a government official has acted 'plainly in excess of [his] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *Federal Education Association v. Trump*, 2025 WL 2738626,

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

at *9 (Sept. 25, 2025) (Pan, J., concurring) (quoting *Global Health Council v. Trump*, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025)). Under the FSLMRS, the President is permitted to exclude agencies or subdivisions from coverage only if the President determines that (1) the agency or subdivision has a primary function intelligence, investigative, or national security work, and (2) the provisions of this subchapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. 5 U.S.C. § 7103(b)(1).

The Executive Order broadly excludes entire Departments and agencies, and "provides no indication that the President made the requisite determinations" concerning each agency or subdivision listed in the Executive Order. *Federal Education Association*, 2025 WL 2738626, at *10 (Sept. 25, 2025) (Pan, J., concurring); *see also NTEU*, 780 F. Supp. 3d at 258 ("Given the breadth of the Executive Order," statements about the "general role of agencies and subdivisions" are "wholly inadequate to assess whether each of the agencies and subdivisions actually falls within the statutory national security exception."). Even within entire Departments that arguably have national security as a primary purpose are sub-agencies and subdivisions that certainly do not have such a primary purpose, and whose employees are not involved with national security work. The Department of Defense is massive, and has dozens of subagencies and subdivisions, many of which are not engaged in national security work or functions. USACE, and specifically the blue-collar laborers that make up the bargaining unit of UPTO, provides the quintessential example.

UPTO bargaining unit employees who work for USACE are civilian employees who do not hold security clearances, and are employed as electricians, mechanics, dam operators, painters, welders, crane operators, and material handlers. *See* Chambers Decl., ¶¶ 6, 9. They do not work on military projects, but instead, on "civil works" projects in the Pacific Northwest that do not serve a national security function. Civil works projects have the purpose of providing "benefits for

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

navigation, flood risk management, hydropower production, fish and wildlife, environmental stewardship, recreation, irrigation, and municipal water supply." *See* U.S. Army Corps of Engineers, Northwestern Division Website, https://www.nwd.usace.army.mil/missions/civil-works/ (last accessed July 1, 2026). UPTO bargaining unit members plainly do not have a primary purpose of national security, and thus, including them in the Executive Order's overbroad exclusions was improper. Additionally, the Government has not moved to terminate the collective bargaining agreement for the Columbia Basin Trades Council, whose members perform substantially the same work as UPTO members, at the same location. *See* Dkt. 1, ¶ 52. This is further evidence that excluding UPTO members from the FSLMRS is arbitrary and improper.

Courts have repeatedly found that the Executive Order at issue here was likely *ultra vires*. *See, e.g.*, *NTEU*, 780 F. Supp. 3d at 259-262 (finding that the Executive Order applies an overly broad interpretation of both the term primary function, and the term national security work); *Federal Education Association*, 2025 WL 2738626, at *10 (Sept. 25, 2025) (Pan, J., concurring) ("By excluding two-thirds of the federal civil service from statutory protections without making the required findings, the Executive Order transforms a circumscribed exception into a general rule."); *AFSA*, 783 F. Supp. 3d at 269 (concluding that AFSA is "likely to succeed on its claim that the Executive Order is *ultra vires*"); *FEA*, 795 F. Supp. 3d at 97 (finding same).

Indeed, as Judge Pan noted in her concurrence in *Federal Education Association*:

> Here, the Executive Order is likely *ultra vires* because it broadly and unlawfully applies the FSLMRS's exclusion provision without regard to statutory mandates, in a quest to use a narrow national-security exception to 'swallow' a general rule that favors union representation. The President likely does not have unfettered authority to unilaterally transform the scope of the FSLMRS, while disregarding the statute's intended reach, purpose, and mandatory requirements."

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 9

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

*Federal Education Association*, 2025 WL 2738626, at *11 (Sept. 25, 2025) (Pan, J., concurring); *see also NTEU*, 780 F. Supp. 3d at 259 ("The President's determination appears to apply an overly broad interpretation of both the term 'primary function' and the term 'national security work.'").

In addition to being improperly broad, the Executive Order is also *ultra vires* because the President relied on an improper basis for the exclusions in the Executive Order. The exclusions, as shown from the Fact Sheet, were based on political animus against federal sector unions, which is not a proper basis for exclusion under Section 7103(b)(1). *See generally* Fact Sheet. The *NTEU* Court stated that

> The scope of the Executive Order when compared with the intent of Congress in passing the FSLMRS, coupled with the surrounding statements in the Fact Sheet and OPM Guidance – which strongly suggest that President Trump's invocation of Section 7103(b)(1) was mere pretext for retaliation and for accomplishing unrelated policy objectives – are persuasive reasons to believe [plaintiff] likely will be successful on the merits of its claim.

*NTEU*, 780 F. Supp. 3d at 258; *see also FEA*, 795 F. Supp. 3d at 97 ("Outside of the scope of the Executive Order, the contemporaneous evidence reflects motivations for the order that are plainly unrelated to the statutory criteria."). The President's actions were completely divorced from national security concerns—union animus and retaliation are not legitimate reasons for exclusion under the FSLMRS.

Thus, the Executive Order is likely to be *ultra vires*, and Plaintiff will be successful on this claim. *See NTEU*, 780 F. Supp. 3d at 259-262; *AFSA*, 783 F. Supp. 3d at 269; *FEA*, 795 F. Supp. 3d at 97 (stating that the invocation of Section 7103(b)(1) to exclude two-thirds of the federal workforce, combined with contemporaneous evidence, "represents that the Executive Order patently disregards the specific and unambiguous statutory directives in the FSLMRS") (cleaned up).

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 10

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

### b. The Executive Order and Termination of the CBA Violates the First Amendment

Plaintiff is also likely to succeed on its First Amendment claims. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To prevail on a First Amendment retaliation claim, a Plaintiff must show that "(1) [the plaintiff] was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (internal quotations omitted). A plaintiff need only show an intention to interfere with First Amendments rights and "some injury as a result." *Ariz. Students Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

Plaintiff engaged in protected First Amendment activity by being an active federal union, and bargaining with management, to the ire of President Trump, who issued the Executive Order in retaliation. The Executive Order and Fact Sheet make clear that the Executive Order was motivated by anti-union animus, and targeted any non-law enforcement unions, including UPTO. *See* Executive Order; Fact Sheet. The Fact sheet that accompanied the Executive Order stated that "certain Federal unions have declared war on President Trump's agenda." *See* Fact Sheet. It further states that the Civil Service Reform Act of 1978 "enables hostile Federal unions to obstruct agency management" and that the President "refuses to let union obstruction interfere with his efforts to protect Americans and our national interests." *Id.* These statements evidence a retaliatory motive towards non-law enforcement unions. *See NTEU*, 780 F. Supp. 3d at 255 (stating that the Fact Sheets "reflects retaliatory motives towards certain unions"); *FEA*, 795 F. Supp. 3d at 89 (the Executive Order was issued in furtherance of "unrelated policy goals").

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 11

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Notably, the Fact Sheet emphasizes that "Law Enforcement Unaffected. Police and firefighters will continue to collectively bargain." *See* Fact Sheet. Because the Executive Order is so overbroad in that it includes agencies and subagencies that do not have the primary purpose of national security, while not covering law enforcement bargaining units that clearly do, that have supported President Trump, Plaintiff is likely to prevail on the claim that the Executive Order was issued in retaliation for engaging in protected union activity.

Defendants continued to violate the First Amendment when they terminated the CBA in retaliation for UPTO's continued associational and representational activity. Specifically, Plaintiff has engaged in constitutionally protected speech through its continued and ongoing union activity and association, and in protected speech related to the Executive Order. For example, shortly after the Executive Order was issued, UPTO posted a message about the Executive Order on its public website, stating that it "intended to strip all of us of our collective bargaining rights and essentially eliminate Federal Unions and the vital role they play in protecting workers in the workplace." Chambers Decl., ¶ 10; Exhibit 1 to Chambers Decl. On March 30, 2025, the website post also identified specific actions that UPTO was taking in response to the Executive Order, including trying to coordinate and collaborate with other federal unions in fighting the Executive Order, reaching out to the agency to gather information on the impact and implementation of the Executive Order, and determining how collective bargaining will look moving forward. *Id.*

Further, UPTO engaged in protected activity when, on April 9, 2025, the President of UPTO sent a letter to Defendant Graham, requesting that General Graham lobby for UPTO to retain their collective bargaining rights, and ask that the Secretary of Defense exclude USACE from inclusion in the EO. *See* Chambers Decl., ¶ 12. The President of UPTO followed up with Defendant Graham on September 12, 2025. *See id.*

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 12

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Plaintiff has also engaged in protected activity by conducting ongoing union activity and labor relations since the Executive Order was issued through April 16, 2026, including holding meetings with management, participating in the grievance process, and engaging with management over changes to policies.[1] *See* Chambers Decl., ¶¶ 13-23. Moreover, UPTO engaged in protected activity when it posted on its public website that it had hired a law firm and intended to file a lawsuit in federal court for an injunction on May 26, 2026. *See id.*, ¶ 32.

Second, eliminating the CBA and collective bargaining rights that Plaintiff and its members have enjoyed for decades would chill First Amendment activity by deterring a person of ordinary firmness from speaking again. The harm from the Executive Order and the termination of the CBA is clear and substantial: Plaintiff has lost its ability to bargain on behalf of its employees and enforce the protections of the CBA. *See id.*, ¶¶ 34-38; *supra* Section II.

And third, Plaintiff's exercise of its First Amendment rights was a motivating factor in the termination of the contract. "[T]emporal proximity between the protected activity and the alleged retaliatory conduct" serves as circumstantial evidence of a causal relationship. *Ariz. Students Ass'n*, 824 F.3d at 870. "Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003); *see also Salem v. Terhune*, 72 Fed. Appx. 670, 671 (9th Cir. 2003) ("[W]e have held that even when an alleged adverse employment action takes place several months after an employee's protected activity, the temporal proximity is enough to support an inference of retaliation."). Here, Plaintiff engaged in constitutionally protected speech repeatedly between March of 2025 and April of 2026 when the contract was terminated. *See* Chambers Decl., ¶¶ 10-

---

[1] Defendants did not apply the Executive Order to UPTO until April of 2026

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 13

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

23; 28-31. But, the clearest evidence of First Amendment retaliation is the fact that Defendants made the decision to file a decertification petition with the FLRA *only two weeks* after learning that UPTO intended to file a lawsuit challenging USACE's unilateral termination of the CBA. *See id.*, ¶¶ 32-33. This action, taken after *months* of inaction from USACE with respect to the Executive Order, and only 14 days after UPTO publicly expressed that it would be filing a lawsuit—an activity clearly protected by the First Amendment—is certainly retaliatory, and well within the range of temporal proximity to demonstrate a retaliatory motive.

### c.  The Executive Order Violates the Fifth Amendment

Plaintiff is likely to prevail on its claims that the Executive Order and Defendants' unilateral termination of the CBA violate the Fifth Amendment in two ways: 1) the Executive Order and termination of the CBA is an improper taking, and 2) the Executive Order and termination of the CBA violates the guarantee of procedural due process.

### i.  *The Executive Order and Termination of the CBA is an Improper Taking*

The Fifth Amendment provides that "[n]o person shall be ... deprived of … property, without due process of law." U.S. Const. amend. V. The Supreme Court has long recognized that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Cherokee Nation of Okl. v. Leavitt*, 543 U.S. 631, 646 (2005); *Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir. 1993) ("Rights against the United States arising out of a contract are property rights protected from deprivation or impairment by the Fifth Amendment."). As such, Plaintiff has a property interest in the rights created by the CBA because they have "a legitimate claim of entitlement to" them, "not merely a unilateral expectation." *Sanchez v. City of Santa Ana*, 915 F.2d 424, 428 (9th Cir. 1990).

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 14

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

As a result of the Executive Order and subsequent implementation of the EO, and termination of the contract, the Defendants nullified the CBA that was lawfully entered into and extinguished the rights under it to which UPTO is entitled. There can be no question that these actions violate the Fifth Amendment by depriving Plaintiff and their members of their vested, constitutionally protected property interest in the CBA.

> ii. *The Executive Order and Unilateral Termination of the CBA Violates the Guarantees of Procedural Due Process*

The Executive Order and USACE's termination of the contract also violate the Fifth Amendment's right to procedural due process. The Due Process Clause protects against government deprivation of constitutionally-protected property interests. It restricts the "exercise of sovereign power which would impair obligations under government contracts." *Madera Irrigation Dist.*, 985 F.2d at 1401. And it is also violated when plaintiffs are deprived of protected property interests with a "lack of process." *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (internal quotations omitted).

Proving a Due Process violation for abrogation of a government contract requires "1) cognizable property rights arising out of a contract with the government; and 2) that the government has abrogated those contractual rights." *Westlands Water Dist. v. U.S. Dep't of Interior*, 850 F. Supp. 1388, 1402 (E.D. Cal. 1994). Due process requires giving reasonable notice "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, 686 F.3d 965, 985 (9th Cir. 2012). And courts have "long interpreted" the Due Process Clause "to require that notice generally be given *before* the government may seize property." *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008) (emphasis in original).

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 15

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Here, Plaintiff did not receive notice or the opportunity to be heard before the issuance of the Executive Order, before Defendants' unilateral cancellation of the contract, or before USACE filed the decertification petition. *See* Chambers Decl., ¶ 26. Plaintiff also did not receive any opportunity to present their objections to these actions. *Id.* Moreover, although the Executive Order delegated authority to the Secretary of Defense to make exceptions to the exclusions from EO 14251 (and thereby to preserve Plaintiff's property interests), the Secretary of Defense did not provide Plaintiff with any type of process before issuing his order regarding the exceptions or lack thereof. Therefore, Plaintiff will be able to prove that the Executive Order and termination of the CBA violated the guarantee of due process in the Fifth Amendment.

### d. *The Termination of the Contract Violates the Administrative Procedures Act*

Defendant Graham violated the APA by acting arbitrarily and capriciously and contrary to law when he unilaterally terminated the CBA pursuant to EO 14251 and direction from the Secretary of Defense. Therefore, Plaintiff is likely to succeed on its APA claims.

### i. *The Termination Was a Final Agency Action*

For an agency action to be final, it must (1) "mark the consummation of the agency's decision making process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). In assessing administrative finality, courts look to "whether the order has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance is expected." *Cal. Dept. of Water Res. v. FERC*, 341 F. 3d 906, 909 (9th Cir. 2003).

Here, the termination of the CBA was a final agency action because it marked the final step in USACE's and the Department of the Army's implementation of the Executive Order with respect to UPTO. *See Noem*, 785 F. Supp. 3d at 853-855 (reviewing CBA termination as final

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 16

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

agency action). The termination also stripped UPTO's bargaining unit employees and members of bargained-for workplace rights, and thus, it had a "direct and immediate" impact on day-to-day business. As such, the termination is a final, reviewable, agency action.

ii.    *Defendant Graham Acted Arbitrarily and Capriciously*

Agency actions are arbitrary and capricious when the explanation "runs counter to the evidence before the agency." *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Id.* (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). And "when an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

For decades, across every presidential administration, regardless of party, and during times of both war and peace, UPTO and USACE collectively bargained. And during this time period, there was no finding that USACE generally, or UPTO bargaining unit employees specifically, could not collectively bargain under the national security exception to the FSLRMS. Defendant Graham, in his termination memorandum, provided no explanation for the reversal of policy, did not explain why applying the FSLMRS to UPTO is inconsistent with national security requirements and considerations, and did not explain or make a finding that USACE or UPTO employees have a primary function of national security work. *See* Exhibit 2 to Chambers Decl. Importantly, citing just the Executive Order is not sufficient—the agency must still provide a

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 17

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

"reasoned analysis" for their actions. *See S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 752 (N.D. Cal. 2025). Defendant Graham failed to do so.

Additionally, at the time Defendant Graham terminated the contract, Defendant was aware of a court-ordered injunction preventing USACE from implementing the Executive Order with respect to other USACE employees. *See IFPTE*, No. 25-2445, Dkt. 44 (Oct. 1, 2025). Defendant Graham provided no explanation as to why the Executive Order should suddenly be applied to UPTO employees, when it had been enjoined for similar employees. Relatedly, Defendant Graham provided no explanation as to why the Executive Order should be applied to UPTO bargaining unit employees when it was *not* applied to employees performing the same type of work at the same USACE civil works projects as UPTO bargaining unit employees, but who are covered by a collective bargaining agreement with the Columbia Basin Trades Council. Dkt. 1, ¶ 52.

Defendant Graham also provided no explanation as to the reversal of agency policy regarding the Executive Order, as USACE and UPTO had continued to operate as normal and pursuant to the CBA in the more than one year between the issuance of the Executive Order in March of 2025, and the termination of the contract in April of 2026. *See* Chambers Decl., ¶¶ 13-23; 27-31. Notably, it was only *after* Defendant was put on notice of Plaintiff's intent to file a lawsuit that Defendant filed a petition with the Federal Labor Relations Authority to decertify UPTO. *See id.*, ¶¶ 32-33. This timing alone—a mere two weeks after such notification—strongly suggests that Defendant's actions were not based on any rational basis, and were instead based on union animus, and thus, arbitrary and capricious. With no reasoned explanation for the termination of the CBA, and no reasoned explanation for attempting to decertify UPTO, Plaintiff will show that the Defendant's Graham's actions violate the APA.

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 18

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

Moreover, when an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (cleaned up). At no point did USACE, the Department of the Army, or the Department of Defense acknowledge that Plaintiff acted in reliance on the stability of a multiyear, binding CBA. In fact, in June of 2025, Plaintiff received representations from management that the CBA continued in full effect, and that nothing with respect to that relationship was going to change at least until all litigation relating to the Executive Order was finalized. *See* Chambers Decl., ¶ 14; Exhibit 1 to Chambers Decl. Plaintiff's goal was and always has been to improve the lives and working conditions of its bargaining unit members based on the availability of collective bargaining with an enforceable CBA. Defendant's failure to address these reliance interests is yet another reason why Defendant's actions violate the APA, and why Plaintiff will succeed in proving this claim.

### iii.   *Defendant Graham Acted Contrary to Law*

The APA authorizes the Court to "set aside" any action that is "contrary to a constitutional right." 5 U.S.C. § 706(1)(B). As stated above, Plaintiff demonstrates how the Executive Order and Defendant's termination of the CBA violated the First and Fifth Amendments. These constitutional violations are also a reason to grant relief under the APA.

## II.   **Absent Relief, Plaintiff Will Suffer Serious and Irreparable Harm**

Plaintiff and its members are currently suffering, and will continue to suffer, irreparable harm if Defendants are not enjoined. Implementing the Executive Order and terminating the CBA has taken away key rights and protections for Plaintiff and its bargaining unit members, prevented Plaintiff from providing core services to its members, and impaired its constitutional rights.

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 19

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

UPTO and its members, and all those in the bargaining unit, are being irreparably harmed by the termination of the CBA, which strips them of the benefits of union representation. This harm is irreparable because "[t]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) (internal quotations and citations omitted).

Additionally, organizations are irreparably harmed when "they will suffer a significant change in their programs" from agency action. *E. Bay Sanctuary Covenant*, 993 F.3d at 677. UPTO improved conditions of employment by negotiating on behalf of its bargaining unit and by enforcing the CBA's protections. UPTO's ability to do that is now entirely lost. UPTO has lost access to official time and union offices to conduct union activities, *see* Chambers Decl., ¶ 36, and has lost the right to bargain over changes in working conditions which USACE can now implement on a unilateral basis. *See id.*, ¶¶ 34, 37. Notably, changes to working conditions are already being made without UPTO's bargaining input, as USACE has notified UPTO of its intent to change the rating period for employees, and to change the "sensitivity designations" for certain employees.[2] *See id.*, ¶¶ 20, 22. Additionally, the CBA was set to expire in May of 2026, and UPTO intended to give notice of their intent to bargain over a new contract, but they are now prohibited from doing so. *See id.*, ¶ 38.

Even if collective bargaining rights are eventually restored, UPTO will have faced months or years of being blocked from providing core representational services. These injuries are not the type that can be remedied at litigation's end. A loss of bargaining power, even if temporary, cannot

---

[2] At present, UPTO has no knowledge of how USACE's actions in changing "sensitivity designations" will impact employees and their working conditions, and without a CBA, UPTO has no ability to request information to determine how these changes will impact employees.

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 20

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

be restored. And preventing a union from representing its members serves to "discredit the [union] in the eyes of the employees," and diminished support causes irreparable harm because lost bargaining power cannot be restored by any final relief. *Small*, 661 F.3d at 1193 (internal quotations and citations omitted); *see also Hoffman v. Parksite Grp.*, 596 F. Supp. 2d 416, 423 (D. Conn. 2009) ("ongoing failure to recognize the union . . . could significantly damage employee confidence in the union and any effort to exercise their collective bargaining rights in the future"); *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944) ("the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions"); *NLRB. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable."); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

Finally, absent relief, Plaintiff and their members also face irreparable harm because "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017) (internal quotation omitted).

**III.    The Balance of Equities and Public Policy Favors Preliminary Injunctive Relief**

When the government opposes injunctive relief, "the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant*, 993 F.3d at 668.

Here, Congress "unequivocally identified collective bargaining rights and federal unions as being 'in the public interest.'" *NTEU*, 780 F. Supp. 3d at 267 (citing 5 U.S.C. § 7101(a)). And the Government will be unlikely to show that the public interest will be harmed if the court issues

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 21

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

a preliminary injunction. The government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, "there is generally no public interest in the perpetuation of unlawful agency action." *Washington v. DeVos*, 481 F. Supp. 3d 1184, 1197 (W.D. Wash. 2020) (internal quotations omitted). The public interest instead lies in compliance with commitments to employees and "preventing the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). Because the Government's actions are likely *ultra vires* and steeped in retaliatory anti-union animus, the balance of equities and assessment of the public interest weigh in favor of granting a preliminary injunction.

Indeed, courts who have addressed this exact issue dealing with the same Executive Order and similar claims, including by unions representing employees of USACE, have found that the balance of the equities and assessment of the public interest weigh in Plaintiffs' favor. *See, e.g.*, *NTEU*, 780 F. Supp. 3d at 267 ("The Court therefore concludes that the balance of equities and assessment of the public interest weigh in favor of granting a preliminary injunction."); *AFSA*, 783 F. Supp. 3d at 272 (stating same); *FEA*, 795 F. Supp. 3d at 102 ("Granting the preliminary injunction would merely require the government to function as it has for over half a century; the lack of a preliminary injunction, by contrast, would cause immense and irreparable harm to the Union Plaintiffs."); *Noem*, 785 F. Supp. 3d at 861-62 (finding the public interest weighs in favor of an injunction because the hardship "clearly falls on [the union]" and the because of the "constitutional rights at issue and the apparent violations of the APA"); *see also IFPTE*, No. 25-2445, Dkt. 44 (Oct. 1, 2025) (granting preliminary injunction that covers IFPTE employees who do substantially similar work on USACE projects). Granting the requested preliminary injunction will also provide consistency, as Defendants are currently subject to an injunction prohibiting them

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 22

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

from implementing EO 14251 with respect to employees of USACE represented by other unions, namely IFPTE and IBEW.

Accordingly, in light of the unlawful nature of Defendants' actions, restoring the status quo for the pendency of this litigation serves the public interest and supports the granting of preliminary relief.

**CONCLUSION**

For the reasons stated above, Plaintiff is likely to succeed on the merits of its claims that the Executive Order is *ultra vires*, that the Executive Order and implementation violate the First and Fifth Amendments, and that the termination of the CBA violates the Administrative Procedures Act. Plaintiff can also show that it will suffer irreparable harm without a preliminary injunction, and that the balance of equities is in favor of granting a preliminary injunction. Thus, Plaintiff asks this Court to enter a preliminary injunction enjoining Defendants from implementing the Executive Order and terminating the CBA.

Dated: July 14, 2026

*I certify that this memorandum contains 6,896 words, in compliance with the Local Civil Rules.*

/s/ Diana J. Nobile
Diana J. Nobile (admitted *pro hac vice*)
Gregory K. McGillivary (*pro hac vice* motion forthcoming)
Sarah M. Block (admitted *pro hac vice*)
McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
Phone: (202) 833-8855
djn@mselaborlaw.com
gkm@mselaborlaw.com
smb@mselaborlaw.com

/s/ Alexander J. Skalbania
Alexander J. Skalbania (WA Bar #15412)

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 23

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

SKALBANIA & VINNEDGE
3600 15th Avenue W, Suite 1000
Seattle, WA 98119
Phone: (206) 799-6937
Email: askalbania@aol.com

MOTION FOR
PRELIMINARY INJUNCTION, 2:26-cv-2107 - 24

McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855